**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: CARTER P. AND SARAH REESE,** | ) | **Case No. 12-19376** |
| **Debtor(s),** | ) | **Chapter 11** |
| | | |
| **CARTER P. AND SARAH REESE,** | ) | |
| **Plaintiffs** | ) | **Adversarial No. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **POOK & POOK, LLC.,** | ) | |
| **RON POOK,** | ) | |
| **DEBRA POOK,** | ) | |
| **JAMES POOK,** | ) | |
| **JAY LOWE,** | ) | |
| **CONNIE & JAY LOWE ANTIQUES** | ) | |
| **MIKE CAFFARELLA,** | ) | |
| **JAMIE SHEARER,** | ) | |
| **Defendants.** | ) | |

## ADVERSARIAL COMPLAINT

Plaintiff, Carter P. and Sarah Reese (husband and wife, collectively "Reeses"), by and through this Adversarial Complaint against Defendants, allege upon information and belief, except as to the facts and matters that relate to Plaintiff which are alleged upon knowledge, as follows:

### I.    NATURE OF ACTION/JURISDICTION

1)    This is an action for damages and injunctive relief brought by Plaintiff for violations of applicable provisions of Pennsylvania state statutory and common law including Civil Conspiracy, Breach of Fiduciary Duty/Responsibility, Negligence, Breach of Contract (both Good Faith, Fair Dealing &  Dishonesty in Fact Pursuant to 13 Pa.C.S. § 1203), and Unjust Enrichment;

2)    By Opinion dated January 27, 2016 the Court in *Reese v. Pook & Pook, et. al,* E.D.

Pa. No. 14-cv-5715 (Hon. L.S.), has determined the following claims "arose" within this

case and, thus are under this Court's jurisdiction (14-cv-5715, Doc. No. 50);

## II.    IDENTIFICATION OF THE PARTIES

### *Carter P. and Sarah Reese*

3)    Carter P. Reese ("Carter") is an adult individual residing at 140 Evans Hill Road,

Reading, Berks County, Pennsylvania;

4)    Carter is married to Sarah Reese ("Sarah") who is also an adult individual residing

at 140 Evans Hill Road, Reading, Berks County, Pennsylvania;

5)    Carter began collecting toys at the age of ten (10), in 1958, and has been an active,

admired collector for fifty-six (56) years;

6)    He graduated from The Hill School, earning an undergraduate degree in fine arts

and psychology at the University of North Carolina at Chapel Hill; a Master's degree in

Fine Arts (UNC); a Master's of Urban Affairs (Virginia Polytechnic Institute); and a

Master's of Product Design at the North Carolina State University (Raleigh.);

7)    Thereafter, Carter taught fine arts and history at The Hill School before becoming

Director of Admissions, a position he held for approximately fifteen (15) years;

8)    Carter initially began collecting in the fields of American and European toys and

playthings, with his collecting rapidly expanding to antique patent models; salesmen's

samples; scale model live steam toys; Lional, Ives, Marklin (German), Bing (German),

and other toy trains; antique advertising; American art (principally early 20th C.

illustrations - oil on canvas); life-size and larger portrait busts in bronze and carved

marble; American period furniture before 1810; Oriental rugs; antique automobiles and

commercial vehicles; American folk art; fire antiques and full-size antique fire engines;

mechanical antiques, including tower clocks and Gamewell fire service devices; American

cast iron mechanical and still penny banks; and decorative arts in many categories ("Reese

collections");

9)      Carter's credentials as a knowledgeable collector have been established for many

years including:

> *      Assignment of the task of building collections of American
> childhood antiques and artifacts at both The Atwater Kent Museum and at
> the Please Touch Museum for Children, Philadelphia;

> *      Providing (on loan) a full museum show of vintage Steiff toys from
> Germany, etc. for The Port of History Museum, Philadelphia;

> *      Providing (on loan) two full museum shows of American toys and
> folk arts to The Reading Public Museum;

> *      Serving as a Director of The Reading Public Museum for nine (9)
> years;

> *      Carter was The Please Touch Museum for Children, Philadelphia:
> volunteer fundraiser and grant writer; collections committee of the Board;

> *      Providing (on loan) two full museum shows of American antiques
> to The Academy Art Museum, Easton, MD;

> *      Providing (on loan) artifacts to major museum shows to The Baulch
> Institute for Ethnic Studies, Philadelphia;

> *      Providing (on loan) artifacts for many shows at The Public Library
> System of the City of New York;

> *      Solicited by The Margaret Woodbury Strong Museum, Rochester,
> NY to loan/donate a large collection of American playthings to America's
> best-known children's museum. The Strong Museum offered to build a
> thirty thousand square foot (30,000 sq ft) addition to house Carter's
> collections; and,

> *      Providing the foundation collection of toys made by Buddy L
> (Moline, IL) to none other than Bud Lundahl, the son of the owner of
> Moline Pressed Steel Company, whose early hand-made toys were made
> for Bud himself and labeled "Buddy L," indicating that they were the
> property of young Buddy.   Mr Lundahl began a great collection in his
> retirement years and selected Carter's accumulated items as the best he
> could find.

10)     Sarah Reese  is a graduate of Bryn Mawr College (BA) and Harvard University

(MA);

11)    Sarah co-founded and operated, with Carter, an international educational

placement service for eleven years following before selling this highly successful entity to

the London Daily Mail newspaper general trust;

### *The Pook & Pook Defendants*
### (Ron, Debra, and James Pook, Connie & Jay Lowe Antiques,
### and Mike Caffarella ("Pook," "Pook & Pook,"))

### Pook & Pook

12)    The firm of Pook & Pook Inc. was founded in 1984 by Ronald and Debra Pook

("Pooks");

13)    Pook & Pook, Inc. ("Pook & Pook") is based in Chester County, Pennsylvania,

approximately thirty-five minutes west of Philadelphia;

14)    The auction company grew out of the Pooks' antique business, which they had

started a decade earlier in the same location;

15)    Holding its first auction in 1984, Pook & Pook, Inc. has grown to an approximate

annual sales volume of Two to Five Million Dollars ($2-5,000,000.00) in commissions

from the approximate dozen or so auctions it conducts each year;

### Ron Pook

16)    Ron Pook, ("Ron"), is a founder and principal of Pook & Pook;

### Debra Pook

17)    Debra Pook ("Debra") is co-founder, principal, and President of Pook & Pook;

While Debra executed the Term Sheet on behalf of Pook & Pook, for all intents and

purposes Ron negotiated all terms and, for all intensive purposes, acted in Debra's stead,

under her name, title, and authority;

4

### James Pook

18)     James Pook, ("James"), is Ron Pook's son and also a principal of Pook & Pook,
serving as its Vice President, head of Appraisal Services, Condition Reports, and
Appraisal Specialists in American and European Furniture, Books, Manuscripts and
Ephemera, European and American Fine Art, Oriental Carpets and Tapestries, and Trusts
and Estates;

### Mike Caffarella

19)     Mike Caffarella ("Caffarella") is a sixty-something close associate and business
partner of Jay Lowe in the buying and selling of old toys and other antiques;

20)     In the trade, Caffarella would be called a "picker," that, is, one who searches for
antiques and collector pieces that can be resold, often, in this case, in partnership with
Lowe;

21)     For a period of time, Caffarella was employed by James Julia Auctions, with Jay
Lowe, as a business development consultant, "condition" evaluator, and copywriter for
catalogue descriptions in Julia sales and promotional material;

22)     As relevant herein, Caffarella, in combination with Lowe, was Pook & Pook's
agent relative to the sale of certain items from the Reeses' collection of antique toys;

### *Jay Lowe*

23)     Jay Lowe ("Lowe") is an adult individual who, at all times, is engaged in multiple
facets of the antique industry – serving, as is common, as expert, dealer, and purchaser;

24)     Lowe is one of two children of Bob and Genie Lowe who were also antique toy
dealers;

25)     Lowe is known, among other things, to employ and to have employed a series of

restorers over the years to fix, repaint, and otherwise "enhance" old toys and other objects,

to "improve" their condition for resale;

26)     Lowe is also known for recasting old toys and creating multiple new "old" toys

from parts derived from authentic antiques (hereafter designated "newtiques");

### Connie & Jay Lowe Antiques

27)     Connie & Jay Lowe Antiques is, upon information and belief, a sole proprietorship

run and managed by Jay Lowe and his wife, with a principal place of business at 2631

Mondamin Farm Rd., Lancaster, PA 17601-5315 and engaged in the purchase and resale

of antiques;

### The Lowe/Caffarella Partnership
### ("Lowe/Caffarella")

28)     Lowe and Caffarella partner in almost everything related to the antiques trade;

- *      they almost always share booths at old toy and collector shows;
- *      they share pricing strategies on many items; and,
- *       they share a rental case at Adams Antique Market in Adamstown – where
         numerous items from the subject sale, *discussed infra*, were displayed for
         sale;

29)     In fact, until Caffarella left James Julia auctions, both he and Lowe were "co-

consultants" for antique toys, penny banks, some advertising, etc;

30)     Lowe was the doll guy, but Caffarella was the antique dollhouse guy;

31)     Lowe tends to control the relationship between himself and Caffarella, providing

most of the operating funds;

32)     Nearly everything that either of them is doing relative to antiques is shared by the

other;

33)     Caffarella goes around the countryside "picking" then typically will call Lowe with

information about material he finds;

34)   Lowe dominates the relationship on pricing of co-owned objects, then takes his share of profits when they jointly sell each object;

35)   One of the two will show up on Pook & Pook's books of the subject sale – *discussed infra*, as having bought numbereous items at the Reese auction;

36)   Disturbingly, some of the Reeses' collection sold at Pook – as outlined *infra*, ended up in Lowe/Caffarella's shared booth at Adams Antique Market ("Antique Capitol USA");

### III.   THE REESES' TOY COLLECTION(S)

37)   For nearly forty-five years, Carter was primarily a collector, but one who was acquiring vast numbers of American antiques with an eye toward becoming a dealer in high-end antiques and fine art in his retirement years;

38)   The antiques collections Carter has accumulated are massive by any standards - most agree they are among the largest and most diverse in America - and represent a lifetime of cultivated skill;

39)   Currently, the Reese collections amount to some seventeen thousand (17,000) objects with a value range that was substantially in excess of six million dollars ($6,000,000.00);

### IV.   THE OFFENSIVE SALE

40)   Circumstances related to the Great Recession and diminished real estate investments forced the Reeses into this Chapter 11 Reorganization;

41)   The Reeses filed this Chapter 11 Reorganization on October 2, 2012, with the Court confirming thier Reorganization Plan on October 10, 2013 – placing the Estate

including these claims herein within Carter's sole control and direction;

42)    Prior to confirmation of the Reorganization Plan, however, obligations to a secured

creditor required the Reeses to sell a certain portion of their collections from their home—

some two thousand, four hundred (2,400) items;

43)    Pook & Pook successfully applied to the this Court for possession of and the right

to auction the subject items, making it -- and all of the Pook Defendants, Fiduciaries (Dkt.

No. 249);

44)    As Court approved Fiduciaries – with total control over the Reeses' items to be

sold (Exhibit C), Pook & Pook and each of the Pook Defendants owed the Reeses – and

the Court, the utmost in duty and care;

45)    In various conversations between Ron and Carter that took place in the spring of

2013, it was agreed that the collections taken from the Reeses personal home in

Wyomissing Hills, would be sold in several different sales, owing to the great volume he

was being offered;

46)    At no time during the discussions with Ron Pook was it ever mentioned that he

would be turning the entire sale over to his son, James, as Ron and his wife would be on

vacation in Canada for most of the Summer of 2013;

47)    What was discussed and agreed upon, however is that Carter would be involved in

the sale preparations, (particularly to identify objects), and would also be able to review

pre-sale estimates, etc.;

48)    None of that happened;

49)    Concerned at the lack of preparation and concern he was seeing relative to the sale,

Carter called James Pook and was told by James that he had it under control and was

going to use a pair of "toy experts" to assist him;

50)     Carter confirmed that Caffarella and, thus, Lowe were the "toy experts" and immediately disapproved of such;

51)     Carter had previously discussed with James Pook that he was NOT to use either Caffarella or Lowe, but Pook & Pook had total control of the items being sold and over the sale itself;

52)     The set-up and display of the sale – tasks relegated to the "experts" consisted of unmatched parts of various two- and three-part toys, allowing the front end of one horse-drawn toy to go in one box lot with the back end being placed in another lot;

53)     This staging of the Reese collection was a deliberate ploy to diminish value;

54)     Lowe and/or Caffarella and/or the Lowe/Caffarella Partnership– and others, utilized it to purchase items, often at a fraction of their value, reassembling them later to reap phenomenal, illegal profit;

55)     The antiques were largely presented in piles, within cardboard beer flats, on tables, but without any effort to match parts into complete toys;

56)     Horses for cast iron horse-drawn toys were often in one box, while the back-ends were in other boxes;

57)     Obviously, collectors intending to bid online or over the phone never had the chance to sort through and identify boxes of mismatched objects that could have resulted in many more complete toys and, therefore, higher prices than for parts alone;

58)     They saw only haphazard boxes of parts because while the catalogue illustrated some pieces in the auction, online and phone bidders who had not physically come to the pre-sale inspection were at a great disadvantage by not knowing of all of the contents of

any lot or where the various parts could be found;

59)    Therefore, the medium through which half or more of auction sales pass - phone and the various electronic bidding services, was suppressed because the interstate, international bidder could not realize the complete toy might be spread across several lots. Jay Lowe had that special advantage.;

60)    Dealers who attended the Pook & Pook sale were stunned by the incompetence, enjoying a feeding frenzy at the Reeses' expense;

61)    One hungry participant who seemed to know exactly where the best "bargains" were to be had was Lowe;

62)    Rich Garthhoeffner, ("Garthhoeffner") a well respected antiques dealer from Lititz, has been a long-time dealer in American and European toys, and was present for the Pook & Pook sale;

63)    Among other things witnessed, Garthhoeffner will describe the chaotic scene at the Pook auction of the Reese collection;

64)    Of particular note is Garthhoeffner's observation that Jay Lowe was sitting front and center throughout the sale, seemingly knowing every detail of every tray lot full of stuff;

65)    Garthhoeffner observed Lowe observed Lowe bid on some lots, then bid on others that didn't seem to make sense, until one realizes that only Lowe's interests were served by knowing the various parts placements;

66)    Garthhoeffner was so put off that he decided to concentrate on just a few things that he knew he wanted;

67)    Lowe, however, was dozens of lots - some for little - and he seemed to be totally in

charge of the auction room because he alone seemed to know where all the individual

pieces for thousands of items were;

68)      Two things doomed the sale: 1) the disorganization of the material and 2) Lowe

and/or the Lowe/Caffarella partnership arranging then picking through the lots for their

exclusive benefit - not the benefit of the sellers;

69)      Russ Harrington, a nationally known restorer of American toys, described the sale

as a " 'feeding frenzy' of dealers scrambling around, buying parts, trading parts after

the box lots had been sold - an utter disaster for the seller, witnessed but not understood by

the auction house, and a dream come true for dealers and collectors seeking good stuff for

nothing;"

70)      This, of course, was the perfect scenario for Jay Lowe to buy strategic boxes with

"parts" only that could later be reassembled into higher-value toys;

71)      And, to be clear, that is exactly what Lowe and Caffarella did as many of the items

they purchased at the sale ended up in their shared Adamstown market stand – with

significant markups over what was paid for them;

72)      The National Auctioneers Association is the professional organization for

practicing auctioneers, their associates, affiliated businesses and other related

professionals;

73)      Like the various Bar Associations nationwide and nationally, the National

Auctioneers Association has developed a Code of Ethics for the profession as follows --

(in pertinent part):

### ARTICLE 1.

Members pledge to lawfully and ethically protect and promote the interests of the
seller (from now on referred to as the Client).

...

**ARTICLE 3.**

Members shall not accept compensation related to a Client's matter from any third party, even if permitted by law, without the full knowledge of all the parties to the transaction.

**ARTICLE 4.**

Members shall disclose any potential conflict of interest to a current or potential Client.

**ARTICLE 5.**

Members shall not make a profit on expenditures made for a Client without the Client's prior and expressed consent.

... 

**ARTICLE 8.**

Members shall not disclose any confidential Client information without the Client's prior, expressed consent, unless required by law.

**ARTICLE 9.**

Members shall not misrepresent or conceal material facts.

74)     The National Auctioneers Association has also developed minimum Standards of

Practice for the industry as follows (in relevant part):

Members should conduct their business affairs so as to promote a positive image of their business and therefore the auction profession.

Members shall provide the highest level of competent service in those fields in which Members are customarily engaged.

This competency is attained by education, training, study, practice and experience. Competence also includes the wisdom to recognize the limitations of that knowledge and when to seek the counsel, assistance or Client referral appropriate for the circumstances.

The concept of competency also extends to Members who are requested or required to travel to geographic areas where they do not have recent auction experience. Members not in a position to spend the necessary time in a market area to obtain the appropriate understanding of market conditions, may find affiliating with a qualified local auctioneer the appropriate response to ensure a competently conducted auction.

Members must ascertain all pertinent facts necessary to implement a professional marketing campaign.

Members should never publicly criticize a competitor using false or deceptive information. Where an opinion of a competitor's transaction is especially

requested, it should be rendered in conformity with strict professional courtesy and dignity.

75)     Lowe and the Pook Defendants -- including Caffarella, violated nearly all of the above;

76)     In the end, the Pook sale of the Reeses' items brought a total of about five hundred and sixty thousand dollars ($560,000.00) when it should have fetched a far greater amount;

## V.     POOLING

77)     In or about October of 1987, Ron was found guilty (after a week long jury trial) of:

> "conspiring to rig bids at public auction and of transporting antiques across state lines in violation of federal law"

(Exhibit A);

78)     Pook's conviction came after a two (2) year federal investigation which revealed that Pook and a dozen other Philadelphia-area dealers had artificially deflated prices at sale, reselling them amongst themselves for profits of three to four hundred percent (3-400%) and beyond – giving the unaware sellers as little as twenty-five cents ($.25) on the dollar and brazenly deducting auctioneer commissions and fees therefrom (Exhibit B);

79)     Carter's expressed concerns over Lowe/Caffarella's involvement with the sale of his items was founded based on his past experiences involving such;

80)     Lowe had caused Carter big problems in the past by bad-mouthing the Reeses' antiques at James Julia auctions, then buying dozens of lots for he and Caffarella to resell;

81)     For example, Lowe has worked for years as an independent contractor for Julia Auctions in Maine, with the commission-only task of gathering up collections for auction

– and the added benefit of being able to Pool items sold;

82)     The various records Defendants are statutorily required to maintain will, without

question, quantify exactly who, if anyone, was involved in a Pooling scheme at all times

relevant to the Pook sale of the Reeses' items;

### VI.     POOK'S PROMOTION OF LOWE'S "NEWTIQUES" OVER THE REESES' REAL ANTIQUE TOYS

83)     The cover of the Pook & Pook Auction Catalog of the Reese sale prominently

promotes a near fake, one of Lowe's "newtiques";

84)     It is called the "Burning Building" Lowe, previously, had evidently found a

damaged Burning Building toy, made by Carpenter in the late 19th Century, and decided -

as he and his father had done before - that he could take original parts from that toy and

place them, one on each example, as part of  "new" antique Carpenter Burning Buildings -

antiques that never were;

85)     Years prior, Carter purchased a Burning Building toy from Lowe without knowing

it was one of Lowe's recast "newtiques";

86)     Working with an antique toy restorer, Lowe had had the new Burning Buildings

put together and a few were sold for big money, including the one Carter had purchased

with Lowe representing that it was all good, except for a few replacements;

87)     Most auction catalogues include more than one object on the front cover, for two

reasons;

88)     A featured antique chosen for the catalogue cover assures a higher price for that

object, since many buyers lack confidence or want the bragging rights associated with

having bought the best stuff from the auction;

89)     An antique that appears on a sale catalogue's front cover offers the buyer the

additional confidence to know that this is the best that will be found in this sale; it is

absolutely authentic and thoroughly pre-vetted for high quality;

90)    When a single object is selected for a catalogue's front cover, it is a far greater

statement of that object's worth in relation to all other material included in that sale;

91)    It is the best and, in the opinion of the auction house, the single piece that must

bring the highest sale price;

92)    It is an absolute, un-controvertible reality: this item carries the banner for the entire

auction;

93)    When an auction includes approximately 2,400 objects and the auctioneer asserts

that he and one of his star employees know this category very well, what are the odds that

these "experts" would choose the one and only fake antique from the entire load for the

solo cover photo?;

94)    Close to zero.

95)    What are the odds that their "consultant" would select for the auction house an

item for the cover that would benefit his partnership with Lowe alone?;

96)    Presenting a catalogue for a million-dollar + auction involves thought or guidance

from an expert;

97)    The photos should be crisp and clear, the descriptions should be accurate and as

honest as the auction house can be;

98)    And the cover should be the best piece - the one object that portrays the best of

what will be found inside the catalogue and, on the day of the sale, on the auction floor;

99)    Curiously, the miserably botched presentation of the Reeses' material on Pooks'

auction floor did make one attempt to offer a feature: In front of the horrible mess - photos

of which Pook will have for their records - on a small display base stood Lowe's fake

Carpenter Burning Building!;

100)   So to was this recast toy – a Lowe newtique, that was used on the cover of the

auction catalogue;

101)   But the fake object Lowe obviously chose for James Pook for the Reese catalogue

cover only damaged Reese because of the horrible message that was sent to prospective

buyers about what was actually inside the catalogue;

102)   When Carter bought the Burning Building, he paid Lowe twenty thousand dollars

($20,000.00) for it knowing only that there were a few replacement parts in it - a common

condition in old or broken toys of which there may be no known perfect examples;

103)   Carter only later learned what he purchased was one of Lowe's newtiques, a fake;

104)   In ensuring his newtique landed the cover of the Reeses' catalogue, Lowe was

actually protecting – and promulgating, the future sales value of the remaining fake

Burning Buildings in his inventory or in the hands of other who had also been misled (if

the price had fallen, some would have wanted their money back from him for those

already sold);

105)   Together with the utter disarray of the sales floor on auction day and the frenzy

that resulted, with dealers in a melee over parts boxes, etc., the prominent display of the

fake Burning Building - on the cover and on the sales floor - signaled that this was a junk

sale;

## VII.   CAUSES OF ACTION

### COUNT I
*Civil Conspiracy/Combination*

106)   All preceding and subsequent paragraphs are incorporated herein as though set

forth in complete detail below;

107)    A valid claim for civil conspiracy in Pennsylvania is made when it is showed: "two

or more persons combined or agreed with intent to do an unlawful act or to do any

otherwise lawful act by unlawful means" (*Skipworth by Williams v. Lead Indus. Assoc.*,

690 A.2d 169, 174 (Pa. 1997));

108)    The test is otherwise stated as: "a combination of two or more persons acting with

a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an

unlawful purpose" (*Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008), *appeal denied*,

2009 Pa. LEXIS 510 (March 24, 2009));

109)    Pook as principal, Caffarella as Pook's agent, and Lowe combined or agreed with

intent to do an unlawful act, or to do an otherwise lawful act by unlawful means in the

manner described above;

110)    As a direct and proximate result of Pook, Caffarella, and Lowe's joint and

concerted action, combination and conspiracy as alleged herein, Plaintiffs have suffered

damages, and Defendants are jointly and severally liable for those damages;

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their

favor, awarding actual damages, punitive damages, and statutory damages to the fullest

extent allowed, attorney's fees, costs and fees, and such other relief as the Court deems

necessary and proper.

## COUNT II
### *Breach of Fiduciary Duty/Responsibility*

111)    Plaintiffs incorporate herein all prior averments as though set forth in complete

detail below;

112)    A confidential relationship is created when trust is reposed by one party in another

with resulting superiority and influence exercised by the other *See, Somers v. Somers et al.,* 613 A.2d 1211 (Pa. 1992);

113)   The Sanctified relationship between Carter and Sara Reese and the Pook Defendants – including Caffarella, was such a relationship (Id);

114)   Among the most common ways fiduciaries breach the duties correlative to their special status are the following:

- self-dealing (i.e., through conflict of interest or reaping of extra profits);
- usurpation of business or corporate opportunity;
- misappropriation of funds or property;
- neglect, imprudence, or want of skill (e.g., failure to administer [auction] as prudent administrator, …[and] improper reliance on professionals);
- failure to act in another's best interest;
- misrepresentation/omission as to a statement of fact (e.g., financial condition/statement of affairs);
- inducement;
- breach of an assumed duty (e.g., to provide accurate information);
- misuse of confidential information/breach of confidentiality;
- misuse of superior knowledge;
- failure to disclose; [and]
- aiding and abetting or acting in concert with another; … .

*Somers, supra.*

115)   Nearly all of those independent and actionable Breaches are implicated in this matter;

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their favor, awarding actual damages, punitive damages, and statutory damages to the fullest extent allowed, attorney's fees, costs and fees, and such other relief as the Court deems necessary and proper.

## COUNT III
### *Negligence*

116)    Plaintiffs incorporate herein all prior averments as though set forth in complete

detail below;

117)    Negligence is established by proving the following four elements: "(1) a duty or

obligation recognized by law; (2) a breach of that duty; (3) a causal connection between

the conduct and the resulting injury; and (4) actual damages." *Estate of Swift by Swift v.*

*Northeastern Hosp.,* 456 Pa.Super. 330, 690 A.2d 719, 722 (1997);

118)    As demonstrated above, in the best light, Defendants have breached duties owed

the Reeses and, as a result, the Reeses have been injured, suffering actual damages.

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their

favor, awarding actual damages, punitive damages, and statutory damages to the fullest

extent allowed, attorney's fees, costs and fees, and such other relief as the Court deems

necessary and proper.

## COUNT IV
### *Breach of Contract*
### <u>Good Faith, Fair Dealing</u>

119)    Plaintiffs incorporate herein all prior averments as though set forth in complete

detail below;

120)    The general duty of good faith and fair dealing in the performance of a contract as

found in the Restatement (Second) of Contracts § 205, has been adopted in this

Commonwealth in *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Trust Co.,*

385 Pa.Super. 30, 35, 560 A.2d 151, (1989), and *Baker v. Lafayette College*, 350

Pa.Super. 68, 84, 504 A.2d 247, 255 (1986), aff'd, 516 Pa. 291, 532 A.2d 399 (1987);

121)    The obligation to act in good faith in the performance of contractual duties varies

somewhat with the context, *Baker, supra*, 350 Pa. Superior Ct. at 84, 504 A.2d at 255, and

a complete catalogue of types of bad faith is impossible, but it is possible to recognize

certain strains of bad faith which include:

* evasion of the spirit of the bargain,
* lack of diligence and slacking off,
* willful rendering of imperfect performance,
* abuse of a power to specify terms, and
* interference with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts, § 205(d).

122)    As outlined above, the Pook & Pook Defendants have breached their duty of good

faith and fair dealing to the Reeses in multiple ways;

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their

favor, awarding actual damages, punitive damages, and statutory damages to the fullest

extent allowed, attorney's fees, costs and fees, and such other relief as the Court deems

necessary and proper.

### **Dishonesty in Fact**

123)    Plaintiffs incorporate herein all prior averments as though set forth in complete

detail below;

124)    A similar requirement to the general duty of good faith and fair dealing found in

Restatement (Second) of Contracts § 205 has been imposed upon contracts within the

Uniform Commercial Code by 13 Pa.C.S. § 1203;

125)    The duty of "good faith" has been defined as "[h]onesty in fact in the conduct or

transaction concerned." *See* 13 Pa.C.S. § 1201;

126)    As outlined above, the Pook & Pook Defendants have been Dishonest in Fact as

contemplated by 13 Pa.C.S. §§ 1201-1203;

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their

favor, awarding actual damages, punitive damages, and statutory damages to the fullest

extent allowed, attorney's fees, costs and fees, and such other relief as the Court deems

necessary and proper.

## COUNT V
### *Unjust Enrichment*

127)    Plaintiff incorporates and re-alleges the preceding paragraphs as though the same

were fully set forth at length herein;

128)    Pook, Caffarella, and Lowe jointly benefited, and continue to benefit, from

exploitation Plaintiffs as outlined above;

129)    Plaintiffs have conferred upon Defendants economic opportunity and actual

economic benefit, in the nature of profits resulting from unlawful auction practices and

other conduct described above, to the economic detriment of Plaintiffs;

130)    The financial benefits illegally derived by Defendants rightfully belong to

Plaintiffs as they have been subjected to illegal practices, inuring to the benefit of the

Defendants;

131)    It would be inequitable and violate common law relative to unjust enrichment, for

Defendants to be permitted to retain any of the profits derived from Defendants' illegal

auction practices and acts as outlined herein;

132)    Plaintiffs seeks an Order compelling Defendants to disgorge their unlawful and

inequitable proceeds for the benefit of Plaintiffs;

WHEREFORE, Plaintiffs pray this Honorable Court will enter judgment in their

favor, awarding disgorgement of profits, actual damages, punitive damages, and statutory

damages to the fullest extent allowed, attorney's fees, costs and fees, and such other relief

as the Court deems necessary and proper.

Dated: 2/3/16            O'KEEFE, MILLER & THIELEN, P.C.


                    By:    /s Joseph A. O'Keefe
                           PA. I.D. 77068
                           22 E. Main Street,
                           Fleetwood, PA 19522
                           (610) 944-1959

                           Attorney for Plaintiffs

# EXHIBIT A



Subscriber Services | The Inquirer | DAILY NEWS

| Home | News | Sports | Entertainment | Business | Food | Lifestyle | Health | Marketplace |

Collections • **Public Auction**

# Jury Convicts Chesco Antiques Dealer Of Antitrust Violation For 'Pooling'

**By Lita Solis-Cohen, Inquirer Antiques Writer**
**POSTED: October 27, 1987**

Downingtown antiques dealer Ronald Pook was found guilty yesterday of conspiring to rig bids at public auction and of transporting antiques across state lines in violation of federal law.

Pook, 41, admitted taking part in the once-common practice called "pooling" by antiques dealers, but he maintained that the practice was not illegal.

By deciding that pooling violated the Sherman Antitrust Act, the federal jury sent a message to the antiques trade that pooling at public auction is a crime. U.S. District Judge Norma L. Shapiro set sentencing for Dec. 14.

During the weeklong trial, 10 other dealers, many of them friends and colleagues of the defendant's, testified against Pook under grants of immunity

from prosecution or as a result of plea-bargaining with government attorneys.

"When 10 friends testify for the prosecution, it makes it difficult emotionally and legally," Pook said after the verdict.

"Pooling has been discontinued ever since we were informed about the investigation and that the government considered it a crime," he said.

In pooling, some dealers at a public auction agree that only one of them will bid on an item, thereby reducing the number of bidders and keeping the price down. If the dealer bidding for the pool is successful, the dealers hold a second, private auction among themselves, awarding the item to the highest bidder. The dealers then divide among themselves the difference between the auction price and the pool price, thereby cheating the auctioneer of commissions and the seller of the highest possible price.

U.S. Justice Department attorneys Richard S. Rosenberg and Roger L. Currier told the jury that Pook took part in dealer pools at auctions in Pennsylvania, Delaware and New Jersey from 1980 to 1985.

The antitrust violation carries a maximum penalty of three years in prison and a fine of $250,000.

Pook is one of 12 Philadelphia-area dealers charged as co-conspirators in pooling as a result of a two-year federal investigation, which came after complaints by area auctioneers. The auctioneers said that they were losing commissions and that sellers were not receiving maximum price for goods sold.

The 11 other dealers pleaded guilty in recent months to the antitrust charge in plea-bargain agreements with the Justice Department and received sentences ranging from fines of $1,000 to $50,000 to a 30-day jail sentence.

The highest fine was imposed on Philip H. Bradley Co. of Downingtown, one of the largest antiques dealers in the area. Bradley himself was fined an additional $5,000. Pook was the only dealer who



[ 0 ] [ 0 ] [ 0 ] @
Like   Tweet   8+1



Blandon PA Residents Are 'Rattled' By New Website



Get personalized investment advice and guidance.

TIAA CREF
Financial Services    Learn More

### We Recommend

4 Antiques Dealers Accused Of Bid Rigs 'Pooling' Case Called First In Probe Of 'widespread' Illegalities
*January 8, 1987*

Sixth Dealer Accused Of Rigging Bids
*June 23, 1987*

'Pooling' Antiques Dealer Gets Month In Jail
*March 10, 1987*

5 Antiques Dealers Fined For Plotting To Rig Bids
*October 15, 1987*

### Find More Stories About

**Public Auction**

pleaded not guilty.

In the last two years, more than 150 auctioneers and antiques, rug and jewelry dealers in the Philadelphia area have been subpoenaed by FBI agents and ordered to testify before a federal grand jury and turn over records to government investigators.

Much of the testimony in the weeklong trial came from dealers and other witnesses of how pooling worked to cheat sellers out of money they should have received.

James Kilvington, a Dover, Del., dealer, testified that at a 1983 public auction in Chester County, a wing chair was sold for $500. He said that after a private auction among the dealers - sometimes called a "knockout" - he paid $1,900 for it, and $1,400 was distributed to the other dealers. The owner received only $500, minus the auctioneer's commission, he said.

In other testimony, a Delaware County woman, Margaret M. Hood, said she received $1,325 for a desk sold by Chester Heights auctioneer George Wilson at her house sale in 1984. In court, Pook admitted that he later paid $4,800 for the desk in the pool auction.



Get personalized
investment advice
and guidance.

TIAA CREF
Financial Services

Learn More

comments powered by Disqus

**Commenting policy** | **Comments FAQ**

## FEATURED ARTICLES



There but for the grace of God



Nutter signs bill extending mothers' rights on breast-feeding



Sister skateboarders

### More:

In Bulk Trucking, Chemical Leaman Is Rolling Toward The Top

Frank Nofer, 71, famed graphic artist

George Mattson, 88, Olympian, Crew Coach

De Mazia Art Brings $2.38 Million

Leader Of Jbm Sentenced To Life Aaron Jones Was Convicted Of Conspiring To Distribute $100 Million In Cocaine. He Plans To Appeal.

Jbm 8 Believed Founders

---

# EXHIBIT B

# philly●com

Subscriber Services | The Inquirer | DAILY NEWS

Home | News | Sports | Entertainment | Business | Food | Lifestyle | Health | Marketplace

Collections • Justice Department

# 4 Antiques Dealers Accused Of Bid Rigs 'Pooling' Case Called First In Probe Of 'widespread' Illegalities



0  0  0  @
Like  Tweet  8+1

By Lita Solis-Cohen and Michael D. Schaffer, Special to The Inquirer
POSTED: January 08, 1987

In what officials described as just "the opening salvo" of an investigation into "widespread" illegal practices, four Philadelphia-area antiques dealers were charged yesterday with criminally conspiring to rig bids at auctions.

The four were accused of violating federal antitrust laws by "pooling" - trying to hold down the price of items offered at auction by agreeing among themselves and with unnamed co-conspirators not to bid against one another.

A pool can depress the price of a major item by as much as 25 percent, said Ted Maurer, a Pottstown auctioneer.

The charges filed yesterday was a result of an 18-month investigation by the Justice Department into pooling in Pennsylvania, Maryland, Delaware and New Jersey.

There were indications that the four dealers were cooperating in the continuing investigation. John Hughes, chief of the mid-Atlantic office of the Justice Department's antitrust division, said here yesterday that he expected the four to plead guilty and that he expected similar charges to be filed against other antiques dealers, as well as dealers in other products.

"Our investigation is spreading geographically and into all phases of auctioneering," said Hughes, who described pooling as "very widespread."

In a statement issued yesterday, Charles F. Rule, acting assistant attorney general in charge of the antitrust division in Washington, called the charges "the opening salvo in our effort to eliminate unlawful auction pools."

The Justice Department identified the four charged yesterday as William H. Bunch of Woodbury; William McCarraher of Coatesville; John J. McClain Jr., of Coatesville, and Ronald Rhoads of Douglassville, Berks County.

They were charged with violating the Sherman Antitrust Act through "unreasonable restraint" of interstate trade in antiques.

Bunch and Rhoads declined to comment. McCarraher and McClain, who share a shop in Exton, could not be reached for comment.

The charges were filed as felony informations. A felony information has the same effect as an indictment but is signed by a government attorney. Indictments are handed up by grand juries.

The filing of a felony information generally means that the defendant is cooperating with the government and that a plea agreement has been reached, according to Hughes. The nature of any agreement between the government and the four charged yesterday would not be revealed until they are arraigned, in 10 to 15 days, he said.

The four face maximum penalties of three years and a fine of $250,000, or twice the monetary gain derived from pooling or twice the



*Prices of previously won items
Don't Pay Full Price  QuiBids


Know the dealYo
43% OFF
Philly.com
$26 – 'Joseph' Musical at Hershey Theatre, Reg. $50
Get This Deal
Deal expires 5d:12h:37m

## We Recommend

T. Rex For Sale Sue, The Dinosaur, Is About To Be Auctioned. But The Bitter Struggle Over Ownership Of Her 65 Million -year-old Bones Is Goind, Going, Gone.
September 22, 1997

A Toy And Train Sale That's An Easter-weekend Tradition
April 17, 1987

Sixth Dealer Accused Of Rigging Bids
June 23, 1987

Jury Convicts Chesco Antiques Dealer Of Antitrust Violation For 'Pooling'
October 27, 1987

## Find More Stories About

loss caused to the seller, whichever is highest.

Justice Department

_____

loading...

Federal officials would not say who brought the complaint that sparked the investigation.

Pools typically work this way:

The pool appoints one dealer to bid for the group. The leader gathers all interested dealers around and often offers the weakest potential bidders money not to bid.

If the pool is successful in buying an item, pool members then auction it among themselves at an informal private sale, called a "knockout," immediately after the public sale.

For the knockout, each dealer writes out a bid on a piece of paper and hands it to the leader, who also submits a bid.

The high bidder gets the item but must pay off other members of the pool through a complicated formula. The item may cost the high bidder considerably more than the auction price, but still less than if it had been purchased in an open competition.

Because the pool pays "artificially low and noncompetitive prices," pooling hurts people who consign their goods to an auctioneer for sale and hurts the auctioneer, whose commission is based on the sale price, according to documents filed in federal court.

"Sellers of goods were not getting full value," said Roger L. Currier, the antitrust division lawyer who headed the investigation.

Before the investigation began, pooling was a common practice, operating in plain view at the back of many salesrooms, according to auctioneers. These days, however, they are almost never seen.

"Everybody is afraid; some dealers have stopped going to auctions altogether," one local dealer said.

Some in the field say the absence of pools has hurt small estate sales held in the country, because dealers make up the majority of bidders at those sales.

"They are no fun anymore; everyone has a long face and is afraid to talk to you," said another dealer. "Some people don't bother to come."

Some dealers have argued that pools have not really been that effective,

because there are so many of them that the prices of auctioned items get bid up anyway. Furthermore, "reserves" (minimum prices set by the seller and the auctioneer) have prevented pools from finding many bargains, some dealers say. Most area auctioneers say, however, that they only rarely employ reserves.

Although country auctioneers complain that the pools depress prices, big Center City auctioneers downplay their significance.

Pooling is "not a major concern, but it has, over the years, somewhat taken its toll," said Samuel M. Freeman 2d, president of the Center City auction firm of Samuel T. Freeman Co.

Only "a handful of people" have been involved in pooling, said James E. Buckley, vice president of the Fine Arts Co. of Philadelphia. "The vast majority" of people involved in the antiques trade operate legitimately, he said.

Maurer, the Pottstown auctioneer, said that the charges filed yesterday were significant as "a declaration on the part of the government that pooling and collusive bidding is illegal. It was hard for auctioneers to convey that to the dealers. Actually, for a good many years, the dealers have not felt it was illegal (to pool). When the dealers entered into this collusive buying, they thought they were being smart, not criminal."

Maurer said his business had not been hurt by a drop in pooling since the investigation began. He said he believed that "certain dealers have boycotted our sales, believing that we instigated the investigation, which could not be further from the fact.

"We feel that pooling is on the wrong side of the law, injurious to our clients, and I have preached that from my podium for 15 years. I cannot condone illicit activity in the marketplace."

comments powered by Disqus

**Commenting policy | Comments FAQ**

## 7 Concealed Carry Myths:

concealedcarryconfidence.org
Sad Truth on why Most CCW Americans are
Training to make good Victims:

## Seized Car Auctions $500

usgovernmentauctions.net
Buy Government Seized Cars 70% Off $1 to
Search Thousands- All Makes!

*FEATURED ARTICLES*

4 Antiques Dealers Accused Of Charges From Case 16-00023-jdf Doc 15 Filed 02/03/16 2 Entered 02/03/16 11:22:73 Desc Main 1/14/14, 11:31 AM

Document          Page 29 of 35







There but for the grace of God        Nutter signs bill extending        Sister skateboarders
                                       mothers' rights on breast-
                                       feeding

*More:*

In Bulk Trucking, Chemical Leaman Is Rolling        De Mazia Art Brings $2.38 Million
Toward The Top

Frank Nofer, 71, famed graphic artist                Leader Of Jbm Sentenced To Life Aaron Jones
                                                     Was Convicted Of Conspiring To Distribute
George Mattson, 88, Olympian, Crew Coach             $100 Million In Cocaine. He Plans To Appeal.

                                                     Jbm 8 Believed Founders

Index by Keyword | Index by Date | About Philly.com | Contact Us | Terms of Use & Privacy Statement | Copyright 2014

# EXHIBIT C



463 East Lancaster Ave. • Downingtown, PA 19335 • (610) 269-4040 • Fax (610) 269-9274

Term Sheet

     The following are the terms for the retention of Pook & Pook, Inc. ("P&P") to provide auction services to the Chapter 11 Bankruptcy Estate of Carter Reese and Sarah Reese (collectively the "Sellers"). This term sheet, and all of its terms and obligations, shall be subject to the obtainment of Bankruptcy Court approval as set forth herein.

     1.     The Sellers shall retain P&P to provide auction services for the sale of all antiques, collectibles and other tangible personal property, other than the Seller's personal effects, currently located at the Seller's 84 Grandview Boulevard, Spring Township, Berks County residence, excepting only no more than twelve items to be identified and agreed to by the parties.

     2.     After receipt of a final order of the bankruptcy court as described below, P&P will remove all Auction Items from the Grandview Boulevard Residence, which, in the opinion of P&P, are of sufficient value to justify inclusion in the auction and transport such items to its auction facility in Downingtown, Pennsylvania. In the course of such removal, P&P will compile an inventory of the Auction Items.

     3.     Removal of the Auction Items from the Grandview Boulevard Residence will be completed no later than June 15, 2013.

     4.     Upon completion of the removal of the Auction Items, P&P will advance to the Sellers credit in the sum of Four Hundred Thousand Dollars ($400,000) (the "First Advance"), which sum will constitute an advance on the sale proceeds to be received on such auction sale, provided that P&P verifies that, in its opinion, the Auction Items removed from the Grandview Boulevard Residence represent substantially all of the items previously represented by Sellers to be Auction Items. In the event P&P does not so verify, it shall promptly return all Auction Items to the Grandview Boulevard Residence whereupon this auction agreement shall be null and void and have no further force and effect.

     5.     Provided that P&P verifies the Auction Items as described in the preceding paragraph and in addition to the First Advance, P&P will provide further advances on the sale proceeds as requested by the Sellers at any time after October 1, 2013 and on or before to January 1, 2014 up to a total limit of Five Hundred Thousand Dollars ($500,000) reduced in the manner set forth in paragraph 7 ( in the aggregate, the "Second Advance"). No more than one-half of the then current limit of the Second Advance may be requested during the month of October, 2013.

     6.     Proceeds from the sale of the Auction Items shall be paid and applied in the following order of priority:

3941562



**Pook & Pook Inc.**     463 East Lancaster Ave. • Downingtown, PA 19335 • (610) 269-4040 • Fax (610) 269-9274

      (a)     in payment of all commissions and premiums to which P&P is entitled;

      (b)     in permanent repayment of all amounts outstanding on the First Advance and the Second Advance; and

      (c)     to Sellers.

7.     Once repaid, Sellers shall not be entitled to re-advancement of any amount under either the First Advance or the Second Advance. Further, all proceeds paid to Sellers pursuant to paragraph 6 (c). shall reduce the unadvanced portion of the Second Advance available to the Sellers by the amount of such paid proceeds.

8.     The auction of the Auctioned Items will be conducted on such dates and such times as P&P, in its discretion, determines to be appropriate.

9.     P&P will be paid a five percent (5%) commission by Sellers for all sales of the Auction Items up to a total of One Million Eight Hundred Thousand Dollars ($1,800,000) in sale proceeds. There shall be no Sellers' commission on sale proceeds in excess of One Million Eight Hundred Thousand Dollars ($1,800,000).

10.     P&P will be entitled to charge and retain a buyers commission of eighteen and one-half percent (18-1/2%) of the sale price on all sales of the Auction Items.

11.     P&P will not be entitled to reimbursement from Sellers for its labor, insurance, advertising and other expenses associated with the sale of the Auction Items.

12.     In consultation with P&P, Sellers shall be entitled to impose reasonable reserves on some select items to be auctioned hereunder, provided any reserve imposed does not exceed the average of the agreed high and low estimated values for such item. Otherwise, all sales shall be without reserve.

13.     Prior to any action by P&P, Sellers, at their sole expense, will obtain a final unappealable order from the Bankruptcy Court:

      (a)     authorizing the transaction described herein;

      (b)     approving the retention of P&P as auctioneer pursuant to Section 327 of the Bankruptcy Code;

      (c)     approving the compensation to P&P described in this term sheet pursuant to Sections 328 and 330 of the Bankruptcy Code; and



**Pook & Pook Inc.**   463 East Lancaster Ave. • Downingtown, PA 19335 • (610) 269-4040 • Fax (610) 269-9274

(d)    granting Sellers the right to sell all of the Auction Items free and clear of any liens or encumbrances; and

(e)    granting  to P&P a superpriority lien encumbering the Auction Items and all cash and noncash proceeds (including without limitation, insurance proceeds and credit card receivables), superior to all other liens and claims, including existing security interests and administrative claims, as security for advances P &P makes to Sellers as described in paragraphs 4 and 5 above.

14.    Except as otherwise provided in this term sheet, the sale of the Auction Items will be conducted according to the standard terms and conditions of P&P for such sales.


Debra S. Pook
Pook & Pook, Inc.


Carter Reese (seller)


Sarah Reese (seller)

3941562

## 12 EXCLUSIONS FROM 84 CONTENTS

Ship Model of BREMEN (living room)

Locomotive & Tender, Oregon (living room)

High Chest of Drawers (living room)

Carved Wood Folk Art Eagle (atop high chest, living room)

Marble Bust of Washington (center hall)

Bronze Bust of Franklin (center hall)

Marble Bust of Napoleon (center hall)

Boy Scout Oil on Canvas (dining room)

Tower Clock (dining room)

Carved Wood Snuff Figure (dining room)

Half Model of River Dredge (TV room)

High Chest (end of hall, adjacent to kitchen)

**Subj:**  **Grand View Blvd.**
**Date:**  5/8/2013 12:01:44 P.M. Eastern Daylight Time
**From:**  d.pook@verizon.net
**To:**  carterpreese@aol.com

Carter,

We covered a lot of ground yesterday. I believe that I misunderstood the basic premise – that I was buying all the contents, not what is in essence a 50% share to be split after reaching 1.8 million.

I think we can come up with a plan that works for both of us. I am not greedy, but this is a labor and advertizing intensive project that I want to do right.

As for the up front money – I will pick up everything and remove it from the home starting in May and have the house emptied by June 15th. At that time I'll give you a check for $400,000.00 with paperwork to state that a further $500,000.00 is due at appropriate intervals before January 1, 2014.

I know that you believe that the value is well in excess of 2 million, but it is very difficult for us to make that determination without some serious inspection and evaluation. To protect my investment as well as the considerable expense to auction the collection in a highly promoted sale – I propose that

1. You receive the advance payments at stated
2. Pook & Pook with charge a 5% commission on the sale up to 1.8 million and 0% on the rest of the sale
3. You keep all proceeds from the sale

I will have plenty of skin in the game as I really need the sale to approach or go over the 2 million mark for me to make it worthwhile for my involvement which will be serious. Let me know your thoughts.

Ron

Debra Pook
President
Pook & Pook, Inc.
Auctioneers and Appraisers
463 E. Lancaster Ave.
Downingtown, PA 19335
(610) 269-4040
d.pook@verizon.net
Facebook  Twitter

 Please consider the environment before printing this e-mail